# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID ROGERS and OPTION-X, LLC    :
                                      :
               **Plaintiffs,**       :
      **v.**                     :     **3:16-CV-00137**
                                     :     **(JUDGE MARIANI)**
**GENTEX CORPORATION,**       :
                                        :
          **Defendant.**       :

## MEMORANDUM OPINION

### I. INTRODUCTION

Pending before the Court is a motion to dismiss Counts IV-VII of Plaintiff's Second Amended Complaint. Doc. 71. After the Court issued its motion to dismiss opinion relating to the First Amended Complaint, dismissing the fraudulent misrepresentation, negligent misrepresentation, and fraud claims without prejudice, Plaintiff filed a Second Amended Complaint, re-pleading the previously dismissed claims with additional allegations, and adding a conversion claim. Defendant then moved to dismiss Counts IV-VII of the Second Amended Complaint. For the reasons that follow, Defendant's Motion will be granted in part and denied in part.

### II. FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

On January 26, 2016, Plaintiffs filed a Complaint against Defendant Gentex Corporation. Doc. 1. Defendant moved to dismiss the Complaint on March 4, 2016. Doc. 23. Thereafter, Plaintiffs filed the First Amended Complaint, asserting seven causes of

action: (1) Breach of Contract/Stock Purchase Agreement (Count I); (2) Breach of Contract/Employment Agreement (Count II); (3) Declaratory Judgment (Count III); (4) Violation of Pennsylvania Wage Payment & Collection Law (Count IV); (5) Fraudulent Misrepresentation (Count V); (6) Negligent Misrepresentation (Count VI); and (7) Fraud (Count VII). Doc. 32. Defendant moved to dismiss all claims in the First Amended Complaint. Doc. 34. On March 6, 2017, the Court denied the motion to dismiss Counts I, II, IV, granted the motion to dismiss Count III as moot, and granted the motion to dismiss Counts V, VI, and VII, i.e. the fraudulent misrepresentation, negligent misrepresentation, and fraud claims. Doc. 67. Plaintiffs were granted leave to file a Second Amended Complaint. They did so on March 27, 2017, repeating the claims that survived the previous motion to dismiss, rehashing the dismissed claims with supplemental allegations, and adding a new claim for conversion. Doc. 70. Defendants then filed the motion at issue here, seeking to dismiss Counts IV-VII of the Second Amended Complaint. For purposes of resolving this motion, this Court accepts the Second Amended Complaint's allegations as true.

In December 2011, Plaintiff David Rogers "sold the assets of his company, Artisent, Inc. and the stock of his company Ops-Core, Inc. to Gentex" through a Stock Purchase Agreement ("SPA"). Doc. 70, at ¶¶ 1, 7. The agreement "required Gentex to pay to a company owned by Mr. Rogers, Option-X LLC, a royalty based upon its sale of a particular product." Id. ¶¶ 1, 10. As part of the transaction, Rogers also entered into an Employment

2

Agreement with Gentex, which provided that he would receive a salary and the opportunity to earn a bonus. *Id.* ¶ 1. Also in December 2011, Gentex, along with GC Boston Acquisition, LLC, entered into an Asset Purchase Agreement ("APA") with Rogers. *Id.* ¶ 14. Plaintiffs' claims are primarily based on "Gentex's failure to pay sums due and owing under the parties' various agreements, as well as arising from Gentex's fraudulent misconduct associated with same." *Id.* ¶ 1.

In particular, Plaintiffs allege breach of contract and fraud arising from Gentex's obligations to pay Rogers royalties under the SPA. "Section 2.3 of the SPA provides for a royalty to Option-X arising from the operating profits received by Gentex arising from all orders, contracts, royalties, revenue, and profits resulting from sale of the IHRS chinstrap..." *Id.* at ¶ 10. In the summer of 2013, Rogers contacted Gentex's CFO, Heather Acker, to complain about "delinquent" royalty payments and requesting a "chinstrap profit accounting for 2012." *Id.* ¶ 23. He also stated that "and it is important that we change the precedent for reporting / payments going forward." *Id.* After back and forth discussions, Gentex provided Mr. Rogers "a revised and official chinstrap profit calculation" showing a profit of $4.72 per unit, which allegedly entitled Rogers to royalty payments under Section 2.3 of the SPA. *Id.* ¶ 28. However, "no royalty payment was ever made" by Gentex. *Id.*

The Second Amended Complaint further alleges that "[t]hrough the exercise of diligence, and well-after being presented with the fraudulent accountings, Mr. Rogers discovered that the calculation prepared by Gentex was inaccurate." *Id.* ¶ 29. Plaintiffs

3

allege that Gentex has precluded Plaintiffs "from accessing Gentex's financial information necessary to [] calculate properly those royalty payments owed," but that they have been able to identify at least "several financial improprieties which contributed to Gentex's position that no royalties are owed (or that the royalties which are owed are less than the actual amount which should be paid (but never were))." *Id.* ¶ 31. Plaintiffs allege that based on "informal and anecdotal information [] provided by Gentex," they have been able to find out several ways Gentex has "fraudulently mischaracterized expenses and accounting methods," including improperly including certain expenses in the calculation of the Boston location's overhead, classifying certain expenses as "royalty," and using a different accounting system than the one specified by the SPA, *Id.* ¶¶ 32-35, 39, 41. Plaintiffs also claim that Gentex "conceal[ed] information from Plaintiffs which would allow them to calculate their royalty," and that "by withholding full and complete information from Mr. Rogers which would have allowed him to calculate the royalty owed with precision, Gentex has been able to perpetuate and conceal the full scope of its fraudulent conduct and contractual breaches." *Id.* ¶¶ 40, 41. The allegations relating to the royalty calculations form the basis of Counts I and VI of the Second Amended Complaint, for breach of contract and fraud.

Plaintiffs also bring fraudulent and negligent misrepresentation claims related to Rogers' bonus payment. According to Section 3 of his Employment Agreement, Rogers was "eligible to participate in Company's bonus and incentive programs at same the level

[sic] as employees in similar leadership positions." *Id.* at ¶ 19. Section 11 of the

Employment Agreement, titled "Termination," provides:

> Neither the Company nor Rogers may terminate this Agreement prior to the
> expiration of the Term, except as provided below...If the Company terminates
> this Agreement for Cause, or if Rogers terminates this Agreement for other
> than Good Reason, then the Company shall pay to Rogers, within (30) days
> after the date of such termination, all accrued but unpaid amounts payable
> under Section 3 with respect to the period ending on the date of termination,
> plus unreimbursed business expenses through the date of termination if
> properly incurred and documented, but not any unpaid bonus or other amount
> under this Agreement.

*Id.* at ¶ 24. In December 2014, Rogers "informed Gentex of his intentions to leave

his position in the near future; however, [he] did not specify an exact date at that time."

*Id.* at ¶ 50. Rogers "agreed with senior company management that [his] resignation date

would be decided after a plan was developed and implemented to transition his work

responsibilities to other personnel within the company." *Id.*

Around January 14 or January 15, 2015, Rogers "stopped by Adam Adkins' office

and asked if the company had hit its revenue targets for the 2014 Bonus." *Id.* at ¶ 53. "Mr.

Adkins, the Boston facility accountant for Gentex, replied that he did not think the books

were officially closed, but that based on the year-end reporting that he had seen, the

company 'hadn't come close to meeting the goal of $181 million in revenue.'" *Id.* Around

January 28, 2015, Rogers talked to Heather Acker, the CFO of Gentex, commenting to her

that "it was 'too bad that [Gentex] didn't meet [its] revenue targets this year' to which Ms.

Acker replied, confirming that Gentex did not reach its revenue targets, and stating

5

something to the effect [of] 'some years are better than others – I've been doing this for a long time and at this point I never expect or take anything for granted.'" *Id.* at ¶ 54.

Plaintiffs allege that "[b]ased upon the affirmative representations made by Gentex concerning the 2014 bonuses…Mr. Rogers informed Gentex that his final date of employment would be February 2, 2015, which was then extended to February 6, 2015." *Id.* at ¶ 55. Plaintiffs claim that had Rogers "been informed truthfully by Gentex that company revenue targets had been met and bonuses would be paid, [he] would have deferred his departure until after the bonus payment was made in the early Spring of 2015." *Id.* In March of 2015, Rogers discovered that Gentex "did meet its 2014 revenue targets." *Id.* at ¶ 57. Plaintiffs claim that "[a]ware of Mr. Rogers pending departure and intending to induce him to leave without having to pay the bonus, *Gentex* fraudulently and/or negligently made false representations relating to the 2014 bonus." *Id.* at ¶ 58. This allegation appears to be based on Rogers' conversations with Mr. Adkins and/or Ms. Acker, though the Complaint does not allege how or whether either employee's representations could be equated with Gentex's representations. The allegations relating to conversations concerning bonus payments form the basis of Plaintiffs' fraudulent and negligent misrepresentation claims.

Finally, Plaintiffs adds a new "conversion" claim in their Second Amended Complaint, alleging that Gentex "failed and refused to return" a hard drive owned by Rogers after he left Gentex. *Id.* ¶ 128. Pursuant to the APA, Gentex assumed "all right, title and interest in and

6

to all of the assets of the Business as operated by [Artisent, Inc.], other than the Excluded

Assets." *Id.* ¶ 64. As defined in the contract, "Excluded Assets" included, among other

things, "all confidential or proprietary information that was disclosed to [Artisent, Inc.] by

third parties and with respect to which written consent to disclosure has not been obtained

from the third parties listed on Schedule 2.1(a)(ii)(N)." *Id.* ¶ 65. In other words, Gentex

obtained rights to all assets of Rogers' previous company, Artisent, Inc., except the

"Excluded Assets", which included confidential third party information disclosed to Artisent

pursuant to nondisclosure agreements. After the APA was executed, Rogers "isolated and

segregated those materials which were not part of the asset transaction and did not turn

these items over to Gentex." *Id.* ¶ 67. Instead, he put them on an external hard drive. *Id.*

Plaintiffs claim that the materials on the hard drive "largely consisted of proprietary data

belonging to third parties which had previously been provided to Artisent under non-

disclosure agreements." *Id.*

Upon learning of Rogers' planned departure, Gentex asked if Rogers could provide

"some of the old project data which they understood had been taken offsite by Mr. Rogers at

the time of the acquisition [pursuant to the APA]." *Id.* ¶ 68. Rogers "refused the first two

verbal requests for the data made [by Gentex] during the week of December 8, 2014 and

instead stated that he needed to speak with legal counsel prior to providing the hard drive

contents." *Id.* ¶ 69. The parties then held discussions regarding how Gentex may review

the data on the hard drive "in such a way as to not breach various third party nondisclosure

7

and confidentiality agreements...while at the same time providing confirmation to Gentex that the information on the drive were, in fact, 'Excluded Assets.'" *Id.* ¶ 70. Though the parties did not reach a full agreement as to the review protocol, they agreed a "temporary 'good faith' solution" in December 2014 where Rogers proposed a draft agreement that would "establish a set of protocols so Gentex could review the data to confirm the information was excluded from the asset sale while at the same time protecting the data's confidentiality." *Id.* ¶ 71. At a December 18, 2014 meeting, Gentex's president, Mr. Frieder, "stated that he had not had time to have the agreement fully reviewed by Gentex's legal counsel, but suggested a temporary 'good faith' solution...[where] the hard drive would be locked in a file cabinet in Mr. Rogers's former [Gentex] office without anyone but Mr. Rogers having the access keys." *Id.* ¶ 72. The contents of the drive would be reviewed later "in accordance with the protocol proposed through Mr. Rogers's agreement (with the appropriate Gentex IT and legal representation present)." *Id.* In February 2015, the parties continued discussions, and agreed "to keep the hard drive locked in Mr. Rogers's office file cabinet for safe keeping" and set up "a hard drive meeting...in the following week for proper review of the contents and final resolution of the issue." *Id.* ¶ 73. Plaintiffs claim this "follow-up meeting never happened as Gentex failed to follow up...[i]ndeed, Gentex has failed and refused to return the hard drive." *Id.* ¶ 74.

"In April, 2015, Mr. Rogers was served with a third party document subpoena in a matter pending [in] the United States District Court for the District of Massachusetts"

8

seeking information on the hard drive. *Id.* ¶ 75. "Mr. Rogers immediately contacted Gentex and demanded return of the data contained on the hard drive so he could comply with the subpoena." *Id.* However, Gentex did not return the hard drive, though it did "ultimately retain[] an independent third party IT consulting company to copy the data responsive to the third party subpoena from the hard drive." *Id.* ¶ 77. "That data was supplied to Mr. Rogers so he could comply with the subpoena." *Id.* Thus, while Rogers was able to comply with the subpoena, Gentex "continues to refuse to return the hard drive." *Id.* ¶ 78.

Plaintiffs also allege that "[i]n the process of trying to obtain Gentex's release of the hard drive to obtain the confidential third party data, Mr. Rogers learned for the first time that the hard drive had been taken from the locked office file cabinet." *Id.* ¶ 76. "Further, the hard drive had been hacked and its access passwords were breached by the Gentex IT department so as to gain access to the very same third party confidential data stored on the device that Gentex was explicitly prohibited from seeing." *Id.* However, Plaintiffs do not allege how Rogers "learned" this information. The allegations relating to the hard drive form the basis of Count VII of the Second Amended Complaint for conversion.

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

9

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at

678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal,* 556 U.S. 679).

## IV. ANALYSIS

### Fraudulent and Negligent Misrepresentation (Counts IV and V)

Gentex moves to dismiss Counts IV-VII of the Second Amended Complaint. In Counts IV and V, Plaintiffs allege fraudulent and negligent misrepresentation related to Mr. Adkins and Ms. Acker's representations that Gentex may not meet "its 2014 profit/revenue targets and therefore, would not distribute any bonuses for the 2014 calendar year." Doc. 70 ¶¶ 99, 112. Plaintiffs allege that "Mr. Rogers detrimentally and justifiably relied upon the fraudulent representations of Gentex concerning bonuses for the 2014 calendar year prior to setting the date for his official termination" and that "[b]ut for the fraudulent misrepresentations, Mr. Rogers would have delayed terminating his employment relationship." *Id.* ¶¶ 104, 106. *See also id.* ¶¶ 116, 118 (pleading the same except changing the words "fraudulent" to "negligent"). In sum, Plaintiffs allege that Mr. Adkins and Ms. Acker misinformed Rogers about Gentex's 2014 revenue in order to induce Mr. Rogers to leave Gentex before he would be paid a bonus.

"Under Pennsylvania law, a fraudulent misrepresentation claim has six elements: '(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of

11

misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.'" *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (quoting *Overall v. Univ. of Pennsylvania*, 412 F.3d 492, 498 (3d Cir. 2005)). Where, as here, a party asserts a claim of fraudulent misrepresentation, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard. The Rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Though Plaintiffs identified Mr. Adkins and Ms. Acker as the purported speakers for the alleged misrepresentation, a shortcoming noted by the Court in its previous motion to dismiss opinion, Doc. 66 at 17-18, the claim continues to fall short of adequately pleading all elements of fraud. There are no factual allegations in the Second Amended Complaint that would suggest either Mr. Adkins or Ms. Acker possessed knowledge of the falsity of their representations, or that they intended to mislead Rogers in order to induce him into leaving the company earlier than he had planned. In fact, it is apparent from the face of the Second Amended Complaint that both conversations were initiated by Rogers, and that both Mr. Adkins and Ms. Acker responded with their subjective opinions as to whether Gentex would meet its 2014 revenue target. *See e.g.* Doc. 70 ¶ 53 (alleging that Rogers "stopped by [Gentex accountant] Adam Adkins' office and asked if the company had hit its revenue targets for the 2014 Bonus" and that Mr. Adkins "replied that he did not think the books were

12

officially closed, but that based on the year-end reporting that he had seen, the company 'hadn't come close to meeting the goal of $181 million in revenue.'"); *id.* ¶ 54 (alleging that "Rogers noted to Ms. Acker that it was 'too bad that [Gentex] didn't meet [its] revenue targets this year' to which Ms. Acker replied, confirming that Gentex did not reach its revenue targets, and stating something to the effect [of] 'some years are better than others – I've been doing this for a long time and at this point I never expect or take anything for granted'"). These personal opinions, couched in qualifying language such as Mr. Adkins' statement that he "did not think the books were officially closed" or Ms. Acker's statement that "at this point [she] never expect[s] or take[s] anything for granted [with respect to bonuses]", do not amount to misrepresentations of fact. Such statements, especially when elicited by Plaintiff's own questioning, are not actionable because they reflect the speakers' subjective opinions on Gentex's 2014 revenue projections. *See, e.g., Lookout Windpower Holding Co., LLC v. Edison Mission Energy*, 714 F. Supp. 2d 547, 556 (W.D. Pa. 2010) ("Predictions about the future and expressions of opinion cannot support a common law fraud claim.") (citing *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001); *Tingley-Kelley v. Trustees of Univ. of Pennsylvania*, 677 F. Supp. 2d 764, 782-83 (E.D. Pa. 2010) (dismissing fraudulent misrepresentation claim based on allegations that an university dean told plaintiff, who was applying to veterinary school, "that she was 'doing all the right things,' that things were 'looking good' concerning her applications, and that she remained 'extremely competitive,'" because the dean "never guaranteed that if [plaintiff]

followed his advice, she would be granted admission").

Finally, "[e]ven were these statements construed as fact rather than opinion, plaintiffs have failed to adequately plead that the statements were false, or that [the speakers] knew or believed that they were false." *Johnson v. Draeger Safety Diagnostics, Inc.*, 594 F. App'x 760, 766 (3d Cir. 2014) (applying New Jersey common law for fraud, which comprises of substantively identical elements as those of Pennsylvania law). Here, Plaintiffs have only conclusorily pled that "Gentex," presumably through Mr. Adkins and/or Ms. Acker, "fraudulently and/or negligently made false representations relating to the 2014 bonus." Doc. 70 ¶ 58. Without a factual basis to support the allegation that either Mr. Adkins or Ms. Acker "knew or believed that [their representations] were false," that they acted in representative capacity for Gentex when making those statements, or that they acted with the intention to induce Rogers into leaving Gentex earlier than he had planned, Plaintiffs have failed to plead a fraudulent misrepresentation claim. *Johnson*, 594 F. App'x at 766.

For substantially the same reasons, the negligent misrepresentation claim based on the same facts also fails. To establish negligent misrepresentation, Plaintiffs must allege "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bilt-Rite Contractors, Inc. v. The Architectural Studios*, 581 Pa. 454, 466 (2005) (internal citation and quotation marks omitted). Furthermore, to plead either

14

"fraudulent or negligent misrepresentation, Plaintiffs must allege a misrepresentation relating to a past or existing fact." *Lookout Windpower*, 714 F. Supp. 2d at 556 (dismissing both fraudulent and negligent representation claims for failure to "identify the facts that [plaintiffs] allege were misrepresented" except the conclusory allegation that "Defendants made 'representations of fact regarding the costs and/or revenue projections'").

Here, Plaintiffs have failed to allege facts showing that either Mr. Adkins or Ms. Acker made the alleged misrepresentations "under circumstances in which the [they] ought to have known its falsity," or that they acted "with an intent to induce [Rogers] to act on it." *Bilt-Rite Contractors*, 581 Pa. at 466. Nor have Plaintiffs shown how the misrepresentation relates to a past or existing *fact*, rather than the speaker's personal opinion. Without such factual allegations, Plaintiffs cannot maintain a claim for negligent misrepresentation under Pennsylvania law.

## Fraud (Count VI)

The Second Amended Complaint also brings a fraud claim concerning royalty payments to Rogers. This claim largely rehashes Count VII of the First Amended Complaint, which was dismissed by this Court in its previous motion to dismiss opinion. Doc. 66 at 20-21. According to the Plaintiffs, Gentex made "misrepresentations, mischaracterization and misclassification of revenues, expenses and products in order to fraudulently avoid paying proper and appropriate royalties" due to Rogers under the SPA. Doc. 70 ¶ 122. In the Second Amended Complaint, Plaintiffs supplemented the claim with

15

additional allegations of conversations between Rogers and Gentex regarding royalty

payments. Plaintiffs claim that in the summer of 2013, Rogers "contacted Heather Acker,

Gentex CFO[,] requesting the chinstrap profit accounting for 2012 and first half of 2013." *Id.*

¶ 23. "Mr. Rogers noted that 'These things are very delinquent and it is important that we

change the precedent for reporting / payments going forward.'" *Id.* Ms. Acker then wrote to

Rogers, John Pullo (a Vice President at Gentex) and Travis Lavoie (a senior accountant at

Gentex): "John and Travis – David [Rogers] has inquired about any chin strap royalty due.

Based on my calculations (supported by reports sent by Travis) I did not see any income,

therefore no royalty due. Please take another look and review with David today. I struggled

with the data because the price was so different to start." *Id.* ¶ 24. After Mr. Lavoie's

review, he updated the royalty calculation, showing "a substantial Chinstrap product profit

from 2012 thereby requiring a royalty payment in accordance with the SPA agreement." *Id.*

¶ 26. Ms. Acker then responded: "I can't follow the file or calculation so let's set a time to

review it…" *Id.* ¶ 27. According to Plaintiffs, "weeks then passed with back and forth

attempts at clarification between Mr. Rogers, Mr. Lavoie, and Ms. Acker until Gentex

provided Mr. Rogers with a revised and official chinstrap profit calculation…[which] showed

a profit of $4.72 per unit," which allegedly entitled Rogers to royalty payments under the

SPA. *Id.* ¶ 28. However, "no royalty payment was ever made" by Gentex. *Id.*

Furthermore, Plaintiffs allege that "well-after being presented with the fraudulent

accountings, Mr. Rogers discovered that the [revised] calculation prepared by Gentex was

16

inaccurate." *Id.* ¶ 29. Specifically, Plaintiffs allege that Gentex improperly included certain expenses in the calculation of the Boston location's overhead, classified certain expenses as "royalty," and used a different accounting system than the one specified by the SPA, *Id.* ¶¶ 32-35, 39, and 41. Plaintiffs further claim (without stating their basis for such a belief) that Gentex has withheld "full and complete information from Mr. Rogers which would have allowed him to calculate the royalty owed with precision." *Id.* ¶ 41.

In order to establish common law fraud under Pennsylvania law, "a plaintiff must prove: (1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result." *Hunt v. United States Tobacco Co.*, 538 F.3d 217, 225 n.13 (3d Cir. 2008) (quoting *Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa. Super. Ct. 2006)). As noted above, allegations of fraud are subject to a heightened standard of pleading pursuant to Federal Rule of Civil Procedure 9(b).

For the reasons set forth above in the analysis of Plaintiffs' fraudulent misrepresentation claim, the Second Amended Complaint fails to allege scienter on the part of Ms. Acker, Mr. Pullo, or Mr. Lavoie. In fact, the Second Amended Complaint details a back and forth discussion between the three Gentex employees and Rogers regarding royalty calculations due to Rogers. There is nothing in the relevant allegations that would give rise to an inference that any of the Gentex employees were acting with nefarious intent, or had any reason to act in bad faith, in their discussions with Rogers, save the conclusory

17

allegation that they "knowingly and fraudulently mischaracterized expenses and accounting methods in order to artificially and improperly reduce chinstrap profits so as to avoid paying any royalty." *Id.* ¶ 41. In fact, Plaintiffs' allegation that Gentex's statements "were made with the intent to induce Plaintiffs into inaction by and through the deprivation of royalty payments" is inconsistent with the factual allegations in the complaint. *Id.* ¶ 124. Instead of being lulled into "inaction," Rogers actively sought clarification from Gentex employees on royalty calculations based on his belief that they were not properly calculated, and in response, Gentex made efforts to review and revise the calculations, and informed Rogers of their revisions. *Id.* ¶¶ 23-28, 36-37. Furthermore, it appears that Rogers continued to dispute Gentex's revised calculations, which triggered further review and revision from multiple Gentex employees, *id.,* therefore undermining the suggestion that he has relied on these representations. *See also* Doc. 70, Count VI (failing to plead—even in conclusory fashion—that Plaintiffs relied on Gentex's statements regarding royalty calculations).

Furthermore, the fraud claim relating to the royalty payments is barred by the gist of the action doctrine. Under Pennsylvania law, a party cannot "bring a tort claim for what is, in actuality, a claim for a breach of contract." *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014). "If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract— then the claim is to be viewed as one for breach of contract." *Id.* at 68. "If, however, the

18

facts establish that the claim involves the defendant's violation of a broader social duty

owed to all individuals...then it must be regarded as a tort." *Id.*

"Pennsylvania law recognizes two types of fraud claims that can be brought, as

here, in relation to a contract: fraud in the inducement and fraud in the execution." *Axalta*

*Coating Sys., LLC v. Midwest II, Inc.*, 217 F. Supp. 3d 813, 821 (E.D. Pa. 2016) (quoting

*Batoff v. Charbonneau*, 130 F.Supp.3d 957, 971 (E.D. Pa. 2015)). "Fraud in the inducement

is found where 'an opposing party made false representations that induced the complaining

party to agree to the contract,' while fraud in the execution exists when 'a term was

fraudulently omitted from the contract.'" *Id.* In the context of analyzing fraud in the

execution as a potential defense, the Third Circuit noted that "'[f]raud in the execution'

arises when a party executes an agreement 'with neither knowledge nor reasonable

opportunity to obtain knowledge of its character or its essential terms.'" *Connors v. Fawn*

*Min. Corp.*, 30 F.3d 483, 490 (3d Cir. 1994) (quoting *Southwest Adm'rs, Inc. v. Rozay's*

*Transfer*, 791 F.2d 769, 774 (9th Cir.1986)). *See also IBEW Local Union No. 102 v. Quality*

*Elec. & Data, Inc.*, 488 F. App'x 603, 606 (3d Cir. 2012) ("Fraud in the inducement is not a

defense that is available to [Defendant], and fraud in the execution exists *only when* the

agreement that is signed is radically different from what the defrauded party was led to

believe it was signing.") (emphasis added).

Plaintiffs have not alleged either type of fraud claim that may be brought in relation to

a contract. There are no allegations that Rogers was fraudulently "induced" into agreeing to

the SPA, nor allegations that he executed the SPA without knowledge or reasonable opportunity to obtain knowledge of its essential terms.

At its core, Plaintiffs' claim is not about a party's mistaken belief as to the contract's essential terms or fraudulent inducement, but rather the parties' subsequent *performance* under the contract. They allege that Rogers had a dispute with Gentex over *how* the royalties were calculated under the SPA, including using improper accounting methods and misclassifying certain expenses in order to drive down the royalty payments. Thus, the "gist" of the claim arises from obligations created under the contract itself. Gentex did not owe a broader social duty to Rogers to accurately calculate and pay royalty payments. Rather, the "duty," if any, arises from Gentex's contractual obligation to pay Rogers royalties under the SPA. In fact, the Second Amended Complaint's allegations focus exclusively on how Gentex failed to perform its obligations under Section 2.3 of the SPA. *See, e.g.,* Doc. 70 ¶ 28 (alleging that Gentex failed to pay royalties pursuant to its revised calculation, which "exceeded the $1.00 per unit threshold required in the SPA, Section 2.3."); *id.* ¶ 32 (alleging Gentex misclassified overhead expenses "as described in the SPA, Section 2.3"); *id.* ¶ 35 (alleging Gentex used the wrong accounting system "as was specified by the SPA, Section 2.3"); *id.* ¶ 43 (alleging that "Gentex has breached the SPA, Section 2.3(b)(iv) by not adhering to the accounting terms specified therein and changing its calculation of chinstrap 'operating profits' to result in zero or negative profit."); *id.* ¶ 44 (alleging that "Gentex has breached the SPA, Section 2.3(b)(iv) by not adhering to the terms specified therein and

replacing the Corporation's SAP accounting software...with a different accounting software"). Finally, the Court notes that Count I, which alleges a breach of contract under the SPA based on the same factual allegations, is uncontested by Defendants. In fact, the same claim was held as adequately pled by this Court in its previous motion to dismiss opinion. Doc. 66 at 11. Because the claim is predicated on obligations created under a contract and essentially duplicates Plaintiffs' breach of contract claim, and because Plaintiffs have failed to adequately plead requisite elements of fraud in the first instance, Count VI will be dismissed.

### Conversion (Count VII)

Finally, the Second Amended Complaint added a new claim for conversion, alleging that Gentex improperly withheld a hard drive containing confidential third-party information. When Rogers started working for Gentex, the parties entered into the APA contract, which provided that Gentex would assume rights to all assets of Rogers' former company, Artisent, Inc., "other than the Excluded Assets." Doc. 70 ¶ 64. As defined by the APA, "Excluded Assets" included, among other things, "all confidential or proprietary information that was disclosed to Company by third parties and with respect to which written consent to disclosure has not been obtained from the third parties." *Id.* ¶ 65. After the APA was executed, Rogers "isolated and segregated" the Excluded Assets, i.e. confidential third party data, and took them "offsite" by "mov[ing] this electronic data from Artisent's electronic server to the external hard drive." *Id.* ¶ 67. Upon learning of Rogers' planned departure,

21

Gentex asked Rogers if he can provide "some of the old project data which they understood had been taken offsite by Mr. Rogers at the time of the acquisition [pursuant to the APA]." *Id.* ¶ 68. Rogers refused the first two requests from Gentex, but later began discussions with Gentex regarding how Gentex may review the data "in such a way as to not breach various third party nondisclosure and confidentiality agreements...while at the same time providing confirmation to Gentex that the information on the drive were, in fact, 'Excluded Assets.'" *Id.* ¶¶ 69, 70. The parties reached a "temporary 'good faith' solution" in December 2014 where "the hard drive would be locked in a file cabinet in Mr. Rogers's former [Gentex] office without anyone but Mr. Rogers having the access keys." *Id.* ¶ 72. In February 2015, the parties agreed to set up a "hard drive meeting" to reach a "final resolution of the issue." *Id.* ¶ 73. The meeting allegedly never happened because "Gentex failed to follow up." *Id.* ¶ 74.

In April 2015, pursuant to a third party document subpoena, Rogers demanded the return of the data on the hard drive. *Id.* ¶ 75. Instead of returning the hard drive physically, Gentex "ultimately retained an independent third party IT consulting company to copy the data responsive to the third party subpoena from the hard drive," which was then supplied to Rogers so he could comply with the subpoena. *Id.* ¶ 77. Plaintiffs allege that to date, Gentex "continues to refuse to return the hard drive." *Id.* ¶ 78. They also claim that they have since learned that the hard drive "had been hacked...by the Gentex IT department so as to gain access to the very same third party confidential data stored on the device that

22

Gentex was explicitly prohibited from seeing." *Id.* ¶ 76. However, the Second Amended Complaint does not allege how Plaintiffs learned this information. Defendant argues that the claim should be dismissed because Plaintiffs have failed to plead the elements of conversion, and alternatively, because the claim is barred by statute of limitations.

"[U]nder Pennsylvania law, conversion is the 'deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification.'" *Universal Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (quoting *Cenna v. United States,* 402 F.2d 168, 170 (3d Cir.1968)). "Conversion may be committed by [u]nreasonably withholding possession from one who has the right to it." *Mifflinburg Tel., Inc. v. Criswell*, 277 F. Supp. 3d 750, 794 (M.D. Pa. 2017) (citing *Stevenson v. Econ. Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721 (1964)).

Plaintiffs have adequately pled conversion. The Second Amended Complaint alleges that although Gentex and Rogers engaged in good faith discussions regarding the hard drive's data, those efforts stalled until April 2015, when Rogers made a demand for the hard drive, and Gentex refused to return it. Defendant's argument that Rogers' original transfer of the hard drive to Gentex in December 2014 was "voluntary" ignores the fact that Rogers made an affirmative demand in April 2015, after the parties failed to reach an agreement on what to do with the hard drive's data. Doc. 72 at 16. Furthermore, Defendant's argument that no conversion occurred because Gentex has "expressed

23

willingness 'to return to Mr. Rogers'" the Excluded Assets is unavailing. *Id.* (citing Doc. 70 ¶¶ 77, 79). The fact that Gentex expressed a "willingness" to return the hard drive is not the same as actually returning it to Rogers. Most tellingly, Gentex does not dispute that the hard drive may contain third party confidential data which Gentex never had a right to possess in the first place, nor does Gentex dispute that the hard drive continues to be in its possession.

Gentex's argument that the claim is time barred must also fail. In Pennsylvania, "[t]here is a two-year statute of limitations for claims of conversion and replevin." *Douglas v. Joseph*, 656 F. App'x 602, 605 (3d Cir. 2016). "Under Pennsylvania law, 'a cause of action arises or accrues ... when the plaintiff could have first maintained the action to a successful conclusion.'" *Id.* (citing *Kapil v. Ass'n of Pa. State Coll. & Univ. Faculties*, 470 A.2d 482, 485 (Pa. 1983)). According to the Second Amended Complaint, the parties only agreed upon a "temporary 'good faith' solution" in their discussions, where the hard drive would be locked in a file cabinet in Rogers' former office. Doc. 70 ¶ 72. But they never agreed upon a final resolution as to when or where the hard drive's data would be reviewed. Gentex does not dispute that Rogers had a right to the hard drive's data. Thus, when Rogers made his demand in April 2015, he effectively ended the parties "temporary 'good faith' solution" by asking for the return of the hard drive from Gentex's office. When Gentex refused to return the hard drive upon Rogers' demand, it had begun "[u]nreasonably withholding possession from one who has the right to it." *Mifflinburg*, 277 F. Supp. 3d at 794. *See also Fenton v.*

*Balick*, 821 F. Supp. 2d 755, 761 (E.D. Pa. 2011) ("[W]e find that Defendant initially possessed the Blue Portrait with Plaintiff's permission. Only when Plaintiff demanded its return and Defendant refused did the cause of action for conversion arise, and only then did Defendant's possession become inconsistent with Plaintiff's rights."). Plaintiffs' conversion claim therefore began to accrue in April 2015, when Gentex refused to return the hard drive despite Rogers' demand for it. As the conversion claim was brought in March 2017, less than two years later, it is not barred by the statute of limitations.

## V. CONCLUSION

For the reasons outlined above, Defendant's motion to dismiss Counts IV-VII of the Second Amended Complaint (Doc. 70) will be granted in part and denied in part. A separate Order shall issue.

Robert D. Mariani
United States District Judge